UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dawn Michelle Marth, as Trustee for the
Heirs of Jason Martin,

        Plaintiff,

v.

Officer John Herman, in his individual
capacity,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-4842 ADM/TNL

_____

Andrew L. Marshall, Esq., and Rachel B. Peterson, Esq., Bassford Remele, PA, Minneapolis, MN; Eric Hawkins, Esq., Hawkins Anderson Law Firm, PA, Minneapolis, MN, on behalf of Plaintiff.

Jon K. Iverson, Esq., Amanda L. Stubson, Esq., and Jason M. Hiveley, Esq., Iverson Reuvers, LLC, Bloomington, MN, on behalf of Defendant.
_____

## I. INTRODUCTION

On May 30, 2012, the undersigned United States District Judge heard oral argument on Defendant Officer John Herman's Motion for Summary Judgment [Docket No. 28]. For the reasons stated below, Defendant's Motion for Summary Judgment is denied.

## II. BACKGROUND[1]

This case involves the tragic encounter between an off-duty police officer on his way home from work and two men celebrating a birthday, an encounter which lasted only minutes but which ended with one of the men dead from two gunshot wounds to the chest. On November 2, 2009, friends Jason Martin ("Martin") and Karl Foster ("Foster") met to celebrate Foster's

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

birthday, visiting several bars before deciding to go to the casino at Canterbury Park. See First Foster Aff. [Docket No. 13] ("1st Foster Aff.") ¶¶ 3–6. Because Martin had been drinking, Foster drove Martin's red truck. Id. at ¶ 4. After stopping at a gas station, Foster attempted to get back on Highway 100 in St. Louis Park, Minnesota, but missed the entrance ramp. Id. at ¶ 6. Foster then entered the parking lot of Dunrite Auto to turn around. Id. In the parking lot, he drove over a downed cone thinking the truck had sufficient clearance, but the cone became lodged underneath the truck. Id. Foster then turned onto a side street — Salem Avenue — in an attempt to dislodge the cone. Id. After parking, he crawled under the truck to remove the cone which was stuck on the front axle. 1st Foster Aff. ¶ 7.

At approximately the same time, 2:20 a.m. on November 3, 2009, St. Louis Park Police Officer John Herman ("Officer Herman") was in his unmarked personal vehicle returning home after his shift. Stubson Aff. [Docket No. 16] Ex. A ("Herman Dep.") Ex. 6 ("Herman Statement") 3–4. Officer Herman was wearing black duty boots, blue duty pants, his off-duty weapon (a subcompact 40-caliber Glock 27) in its holster on his left hip, his badge on his belt clip, a black mock turtleneck with "SLPPD" embroidered on the neck, and a brown lined canvas shirt. Id. at 2. Officer Herman observed a red truck drive through the Dunrite Auto parking lot. Id. at 4. Officer Herman saw the truck drive over what he believed was a folding metal construction barrier and then he saw sparks coming from under the truck as it exited the parking lot. Id. Thinking it unusual for a vehicle to be in that lot after hours, Officer Herman suspected something was wrong but "didn't know if it was a burglary, drunk driver, or possibly a medical situation." Id.; see also Herman Dep. 35:17-19. Officer Herman executed a u-turn to approach the truck. Herman Statement at 4. Officer Herman has testified that at the scene he saw Martin

2

hold something over his head and throw it to the ground.  Id. at 4–5.  Foster did not see, and the crime scene photographs do not show, any objects within throwing distance of the truck.  Second Foster Aff. [Docket No. 12] ("2d Foster Aff.") ¶ 3; Peterson Aff. [Docket No. 37] Ex. I.  Officer Herman parked his vehicle approximately three car lengths away from the red truck and dialed 911 with his cell phone, requesting assistance.  Herman Dep. 91:11-19; Herman Statement 4–5.  The site where this encounter occurred is only a block away from the St. Louis Park Police Station.  Herman Dep. 35:23-36-12.

As Officer Herman sat in his vehicle, Martin began to approach him.  Herman Statement 5.  Officer Herman got out of his car and may have identified himself as a police officer at this time.  Compare Herman Statement 5; Herman Dep. 114:5-7 with Herman Dep. Ex. 4.  Officer Herman asked Martin his name and who was driving.  Herman Dep. 114:5-11.  Martin responded by saying something like, "What are you doing here?  You don't need to be here."  Herman Statement 5; Herman Dep. 114:16-18.  Officer Herman may have then identified himself as a police officer, to which Martin again replied, "[Y]ou don't need to be here.  Get out of here."  Herman Statement 6.  By this time, Martin and Officer Herman were near the truck, and Officer Herman noticed Foster underneath the truck.  Herman Dep. 107:18-21.  Officer Herman asked who was driving, and Martin responded that "Foster was sober cab."  Id. at 108:1-9.

Martin and Officer Herman continued to talk, with Officer Herman perhaps identifying himself as a police officer and Martin repeating that he did not need to be there, that he should

leave, and that "you ain't no cop."[2] Herman Statement 6; Craig Martin Aff. [Docket No. 19] Ex. D ("Foster Statement") 12. Officer Herman's badge and gun were covered by his shirt at the time. Herman Dep. 118:24-120:10. Officer Herman stated that he pulled back his shirt so that Martin could see his gun and badge, but it is unknown whether Martin saw the badge or gun. Id. at 120:3-10; 1st Foster Aff. ¶¶ 12, 14; 2d Foster Aff. ¶ 7. Martin became more agitated, saying something like, "I'm a United States Marine and you owe me respect." Herman Dep. 121:1-2; Foster Statement 11-12. Officer Herman responded that he respected that, adding that he had attended Marine Officer Candidate School. Herman Dep. 121:4-5. Martin became enraged at this comment, screaming "that ain't shit," at which Officer Herman backed away. Id. at 121:7-8. Martin moved towards him and Officer Herman "bladed" his body, turning sideways with his gun away from Martin. Id. at 123:9-12.

What happened next is hotly disputed. Officer Herman states that as he looked to his right to locate Foster, Martin hit him in the left ear with a right-handed punch. Id. at 123:21-124:1. Officer Herman avers he repeatedly told Martin to "back off" while keeping his right hand outstretched and his left hand over his gun, but Foster states that he did not hear Officer Herman issue any commands. Compare id. at 126:4-5 with 1st Foster Aff. ¶¶ 9, 11. By this time, Foster had extricated the orange cone from the truck's axle and was running to the scuffle, yelling for them to "stop." 1st Foster Aff. ¶ 11. Foster relates that Martin and Officer Herman threw a few body punches at each other, while Officer Herman states that he never punched but was instead backing up when Martin grabbed his shirt, pulled his head down, and punched the

---

[2] At least one individual in the St. Louis Park area had recently publicly impersonated a police officer. Herman Dep. 69:19-71:4; Kampa Dep. 27:7-25.

left side of his head two more times. Compare id. at ¶ 12 with Herman Dep. 125:7-21. Officer Herman states, but Foster disputes, that Martin hit Officer Herman one last time in the temple, which caused him to see stars, his vision to blacken, and his knees to buckle. Compare Herman Statement 7 with 1st Foster Aff. ¶ 12. Foster states that Martin never reached for Officer Herman's gun, but Officer Herman relates that as he was reeling from the last punch he felt Martin's hand on his hip reaching for his gun. Compare 1st Foster Aff. ¶ 12 with Herman Dep. 128:4-7. Officer Herman states that he thought Martin was going to kill him, so he dropped his left hip and spun in order to get his gun away from Martin. Herman Dep. 128:12-14. Officer Herman repeatedly said "don't" but said nothing else. Id. at 129:18-24. During the physical scuffle, the gun never came out of its locked holster. Id. at 128:19-23. After Officer Herman spun away, Martin did not punch him again. Id. at 129:14-17. Without giving any warning, Officer Herman removed his gun from the locked holster and shot Martin twice in the chest at close range. Id. at 130:10-17; Herman Statement 7. The impact caused Martin to fall and Officer Herman fell down on top of him. Herman Dep. 130:10-17. The entire altercation had lasted less than three minutes. Id. at 106:5-13.

Foster ran to Martin's side while Officer Herman got up and again called 911 on his cell phone. 1st Foster Aff. ¶ 13; Herman Dep. 137:15-16. On this phone call, Officer Herman stated that shots were fired and "he started attacking me! He hit me about four times . . . ." Herman Dep. Ex. 5 ("2d 911 Call"). It is uncontested that during this second 911 call Officer Herman did not mention that Martin grabbed for his gun. Uniformed officers Sergeant Mark Kampa ("Sergeant Kampa") and Aaron Balvin ("Officer Balvin") quickly arrived on the scene. 2d Foster Aff. ¶ 10. Sergeant Kampa forced Foster to the ground and handcuffed him. Id. Officer

Herman told Sergeant Kampa several times that Martin grabbed his gun. Peterson Aff. Ex. F ("Kampa Dep.") 77:4-7. Sergeant Kampa and Officer Balvin administered first aid to Martin, and when Officer Matthew Havlik ("Officer Havlik") arrived he placed Foster in the squad car. Kampa Dep. 51:23-52:2. Martin died on the scene as a result of the gunshot wounds. Foster Statement 15. It is uncontested that Martin was unarmed.

After the incident, Officers Herman and Havlik rode in the ambulance to North Memorial Hospital, where a physical evaluation of Officer Herman found only a small scratch in his left ear.[3] Peterson Aff. Ex. N; Peterson Aff. Ex. O ("Photographs of Officer Herman") 2–3. Officer Herman's medical records include his recount of the events, but they mention only that a "wrestling match" occurred and that Martin "assaulted him," not that Martin attempted to grab his gun. Peterson Aff. Ex. N. Detective Craig Martin was assigned to investigate the incident, and as a result of his investigation determined that Officer Herman was justified in using deadly force. 2d Stubson Aff. [Docket No. 31] Ex. A ("Martin Dep.") 11:19-12:4, 19:3-13. Martin's fingerprints were not found on the gun itself, and the holster was not fingerprinted. Peterson Aff. Ex. U ("Hennepin Cnty. Sheriff's Office Crime Lab. Examination Report); Martin Decl. [Docket No. 36] ¶¶ 5–6. Officer Herman was never criminally charged for this shooting. On December 8, 2010, Plaintiff, the trustee for Martin's heirs, filed the Complaint [Docket No. 1].

### III. DISCUSSION

#### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted

---

[3]Officer Herman also had a scrape on his knee which he sustained after shooting Martin; he testified he thinks it occurred "when I was doing CPR on [Martin]. I think I kneeled on a rock." Herman Dep. 134:6-8.

6

if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party, however, may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

Plaintiff Dawn Marth's Complaint alleges two causes of action, one arising under 42 U.S.C. § 1983 and one arising under Minn. Stat. § 573.02 for wrongful death. Officer Herman's Motion for Summary Judgment seeks to dismiss the Complaint with prejudice, claiming that he is entitled to qualified immunity and official immunity.

**B.  § 1983 Claim - Qualified Immunity**

Under 42 U.S.C. § 1983, police officers, as representatives of the government, are liable for the deprivation of rights guaranteed by the Constitution.[4] 42 U.S.C. § 1983 does not create substantive rights, but rather provides remedies for deprivations of other constitutional rights. Albright v. Oliver, 510 U.S. 266, 271 (1994). A police officer is entitled to qualified immunity unless his conduct violates clearly established rights of which a reasonable officer would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, and it offers "immunity from suit rather than a mere defense to liability." Kenyon v. Edwards, 503 F.3d 722, 724 (8th Cir. 2007) (citing Mitchell v. Forsyth, 472 U.S. 511, 526

---

[4]"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . ." 42 U.S.C. § 1983.

(1985)). Courts employ a two-step analysis to determine whether a government official is protected by qualified immunity. The first part of the analysis is to determine whether the facts alleged show the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 200–01 (2001). Next, the court must determine whether the constitutional right at issue was clearly established. Id.; see also Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005). Both steps of this analysis must be conducted in the light most favorable to the plaintiff. Craighead, 399 F.3d at 961.

### 1. Violation of A Constitutional Right

Both parties agree that the use of excessive or deadly force under § 1983 invokes the Fourth Amendment's guarantee of the right to be free from unreasonable seizures. To establish an unconstitutional seizure, a plaintiff must prove that his person was seized and that seizure was unreasonable. See generally Katz v. United States, 389 U.S. 347 (1967). Obviously, neither party disputes that Officer Herman's killing of Martin constituted a seizure of his person. The use of deadly force by a police officer is a seizure. Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996) ("Terms like 'seizure' and 'intrusive government conduct' cannot capture the facts of this case; it is an unavoidable understatement to observe that the shooting was a seizure."). The right to be free from excessive force is a clearly established right protected under the Fourth Amendment's prohibition of unreasonable seizures. Felder v. King, No. 07-CV-4929, 2009 WL 799612, at *4 (D. Minn. Mar. 24, 2009). However, the parties contest the reasonableness of Officer Herman's actions, with Officer Herman averring his use of deadly force was reasonable and Plaintiff claiming it unreasonable.

Whether a seizure is objectively reasonable is determined "in light of the facts and

circumstances confronting [the officer], without regard to [his] underling intent or motivation." Graham v. O'Connor, 490 U.S. 386, 397 (1989). A court reviewing a police officer's decision must make "allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving." Id. The reasonableness analysis considers the totality of the circumstances, including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. "[I]f the suspect threatens the officer with a weapon . . . deadly force may be used if necessary . . ., and if, where feasible, some warning has been given." Tennessee v. Garner, 471 U.S. 1, 11–12 (1985). Furthermore, summary judgment is inappropriate where a plaintiff "challenges the officer's description of the facts and presents a factual account where a reasonable officer would not be justified in" his actions. Arnott v. Mataya, 995 F.2d 121, 124 (8th Cir. 1993) (quoted by Felder, 2009 WL 799612, at *6). "Deadly force cases pose a unique evidentiary problem because the police officer defendants . . . are often the only surviving eyewitnesses, while the person most likely to contradict their story is dead." Ludwig, 54 F.3d at 470 n.3. Moreover, even where a reasonable police officer might have determined some use of force appropriate, a genuine issue of material fact regarding the objective reasonableness of a specific type of force precludes summary judgment. Bailey v. Cnty. of Kittson, Civ. No. 07-1939, 2008 WL 906349, at *16 (D. Minn. Mar. 31, 2008); see McCaslin v. Wilkins, 183 F.3d 775, 779 (8th Cir. 1999) (denying summary judgment on qualified immunity because "genuine issues of fact exist as to whether McCaslin posed a threat to the officers . . . and whether force was necessary to prevent his escape.").

### i. Disputed Factual Predicate

Summary judgment is inappropriate on whether Officer Herman's use of deadly force was objectively reasonable because the circumstances surrounding the use of force are disputed. Officer Herman contends that during the encounter, which lasted less than three minutes, Martin initiated a physical attack, punched him three or four times, and grabbed his gun. See Herman Dep. 123:9-12, 125:7-126:5, 128:4-7. On the other hand, eyewitness Foster states that he is unsure how the fight started, that he never saw Martin grab for Officer Herman's gun, that he never heard Officer Herman identify himself as a cop or alert Martin that he would use deadly force, and that the scuffle had separated by the time Officer Herman shot the unarmed Martin two times. See 1st Foster Aff. ¶¶ 9, 11, 12. Given these widely divergent versions of material facts, summary judgment is inappropriate. When an officer believes that an individual poses a significant threat of death or serious injury to the officer or others, a seizure-by-shooting is objectively reasonable. Gardner, 82 F.3d at 252 (citing Garner, 471 U.S. at 3). Officer Herman's account of the brief encounter is a factual basis for finding it objectively reasonable to use deadly force because he believed Martin presented a significant threat of death to him.

Conversely, however, Foster's account of the events of November 3, 2009, would lead to a finding that Officer Herman's use of force was not objectively reasonable. Significantly, certain undisputed facts make Officer Herman's use of deadly force objectively unreasonable: (1) Officer Herman used no non-lethal techniques, Herman Dep. 126:20-127:2; (2) Officer Herman and Martin had separated by the time the gun was pulled, Herman Dep. 128:12-129:16; (3) Martin was no longer hitting Officer Herman and was not grabbing for the gun at the time he was shot, id. 128:12-129:16, 138:8-10; and (4) Officer Herman gave no clear warning of his

intention to use deadly force, id. 129:18-24.  This evidence indicates that Officer Herman was not objectively reasonable in his use of deadly force.  Lacking any other evidence of what happened during these fatal couple of minutes, including the absence of fingerprint testing of Officer Herman's holster,[5] the disputed facts are Officer Herman's word against Foster's — a question of credibility, the quintessential province of the jury.  See Kansas v. Ventris, 556 U.S. 586, 594 n.* (2009) ("[I]t is the province of the jury to weigh the credibility of competing witnesses.").

In Ribbey v. Cox, the Eighth Circuit affirmed a district court's denial of summary judgment for a police officer, determining that the qualified immunity defense was inappropriate where the evidence of "just what happened during the critical time just before Cox shot Ribbey" was unclear.  222 F.3d 1040, 1042 (8th Cir. 2000).  In Ribbey, a police officer had broken the car window of a man finally apprehended after a high-speed car chase.  After the glass was broken, the man had turned away from the window and moved his hands.  Id. at 1041.  The plaintiff averred this was merely a reflex to protect himself from the breaking glass, while the defendant police officer asserted that he believed the plaintiff was reaching for a weapon (although no weapon was found in the vehicle).  Id.  This case is similar to Ribbey, albeit with even more disputed facts.  Similar to Ribbey, two plausible competing versions of the critical facts are offered, both of which lead to divergent outcomes.  Unlike Ribbey, though, this case has only one police officer (Ribbey involved at least two police officers) to verify the defendant's version

---

[5]As previously stated, the holster was never submitted for fingerprint analysis, even though the holster may have allowed prints to be lifted.  Martin Decl. ¶¶ 5–6.

of the facts.[6]  Additionally, this case differs from Ribbey because the encounter was not predicated by a crime, no arrest was taking place, and Martin was therefore not attempting to evade arrest when the scuffle began.  Accordingly, as in the much closer case of Ribbey, qualified immunity is inappropriate here.

Officer Herman cites many cases to support that his use of deadly force was objectively reasonable, but all these cases are distinguishable from the events of November 3, 2009.  In Tauke v. Stine, the Eighth Circuit affirmed a district court's ruling that an officer was objectively reasonable in using deadly force against an individual who was armed with two weapons, fired the first shot, fired at officers multiple times, and wounded one officer.  120 F.3d 1363, 1364–66 (8th Cir. 1997).  Given these facts, the Eighth Circuit found that the officer "could reasonably have believed that this was a situation in which there was a significant threat of death or serious physical injury to those at the scene."  Id. at 1366.  The circumstances in Tauke are markedly different than those which Officer Herman faced on November 3, 2009 — Martin was unarmed, and it is uncertain whether Officer Herman was wounded at all or whether Martin reached for the officer's gun.  As such, Tauke is dissimilar to this case and its reasoning does not compel summary judgment.  Numerous other cases cited by Officer Herman also involved a suspect wielding a deadly weapon, and for the same reason they are inapposite here.  See e.g., Whitlow v. City of Louisville, 39 F. App'x 297, *9–10 (6th Cir. 2002) (finding deadly force was reasonable when officer was confronted with an individual wielding a gun and pointing it at the officer); Ballard v. Burton, 444 F.3d 391, 402–403 (5th Cir. 2006) (determining deadly force was

---

[6]This case is also distinguished from Ribbey because it includes testimony from a non-party witness, Foster, although he was admittedly a longtime friend of Martin.  See 1st Foster Aff. ¶ 3 (indicating that Foster and Martin had been friends for approximately fifteen years).

objectively reasonable where officer was confronted with mentally disturbed individual who refused to put down rifle, fired it, and then pointed it at officers); O'Neal v. DeKalb Cnty., Ga., 850 F.2d 653 (11th Cir. 1988) (finding deadly force reasonable when officer was faced with hospital patient armed with pocketknife which he had used to stab seven people).

Officer Herman also cites a recent case in his support, Loch v. City of Litchfield, No. 10-2153, 2011 WL 5598328 (D. Minn. Nov. 17, 2011). In Loch, the officer responded to an emergency call, was told by the individual's family that Loch had a gun, and when confronted, Loch became aggressive. Id. at *2. Unbeknownst to the officer, Loch had disposed of his weapon. Id. Loch did not heed the officer's order to get to the ground, and instead began walking toward the officer. As he did so, Loch slipped on the snow, said the word "kill," and then reached toward a black bulge on his hip. Id. The court held that the officer's use of deadly force was objectively reasonable here, even though the black bulge turned out to be a cell phone holder. Id. Here, however, Officer Herman had no reason to suspect Martin was armed, Martin did not disobey orders or warnings (since none were given), and it is disputed whether Martin ever reached for Officer Herman's gun. Loch, therefore, is also distinguishable from this case.

The most analogous case Officer Herman cites is Nelson v. Cnty. of Wright, 162 F.3d 986 (8th Cir. 1998). In that case, a mentally ill young man left a treatment facility, got into an argument with his mother, and attempted to commit suicide by overdose. Id. at 988. When the police officer responded to Nelson's mother's call, Nelson resisted arrest in a physical struggle which lasted less than three minutes. Id. Nelson admitted that he punched and kicked the police officer repeatedly, twice knocked him down, and reached for the officer's gun. Id. The police officer responded by firing two shots at Nelson, one of which wounded him. Here, unlike

13

Nelson, the parties hotly contest whether Martin grabbed for Officer Herman's gun. Moreover, the physical struggle in Nelson was much more intense than that between Officer Herman and Martin. Foster's version of the facts is that the two only briefly scuffled, with most of the punches directed at the chest or stomach area. See 1st Foster Aff. ¶ 12. Here, the disputed nature of the facts and the material differences between Martin's scuffle and Nelson's brawl distinguish this case from Nelson. Therefore, Officer Herman is not entitled to qualified immunity and summary judgment is denied.

### ii. Lack of Warning

Summary judgment is improper on the issue of whether Officer's Herman's use of deadly force was objectively reasonable because of the state of the record regarding the lack of a warning. When deadly force is employed, a warning is required to be given where feasible. Garner, 471 U.S. at 11–12; Ludwig, 54 F.3d at 470 n.3. While the absence of a warning concerning the use of deadly force does not per se "render [an officer's] use of deadly force constitutionally unreasonable," Krueger v. Fuhr, 991 F.3d 435, 440 (8th Cir. 1993), the failure to warn does "exacerbate the circumstances." Ludwig, 54 F.3d at 474. It is disputed whether Officer Herman gave any form of warning to Martin. The defense argues Officer Herman saying "don't" repeatedly is evidence of a warning. See Herman Dep. 129:18-24. This warning, if given, did not provide Martin warning that Officer Herman was both capable of and preparing to use deadly force.

Moreover, Officer Herman testified it might have been feasible to issue a warning of his use of deadly force. When asked why he had not just said "back off or I'll shoot you," Officer Herman responded "I guess I could have." Herman Dep. 157:21-23. To the extent Officer

Herman now attempts to argue it was not feasible to issue a warning prior to using deadly force, the feasibility of the warning depends on the factual circumstances of what happened during those final moments, and these factual circumstances hinge on credibility determinations. Because of the lack of a warning, the admitted feasibility of a clear warning, and the disputed nature of the events preceding the use of deadly force, Officer Herman is not entitled to qualified immunity and summary judgment is improper.

### 2. Right Clearly Established

After determining that a constitutional violation may have occurred, the Court must then analyze whether a clearly established right was violated. To be "clearly established," the contours of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739–40 (2002) (quotation omitted). While the right to be free from excessive force is clearly established under the Fourth Amendment, Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006), the use of deadly force is justified "where the totality of the circumstances give the officer probable cause to believe that a fleeing suspect poses a threat of serious physical harm to the officer or to others." Ngo v. Storlie, 495 F.3d 597, 604 (8th Cir. 2007) (quoting Thompson v. Hubbard, 257 F.3d 896, 899 (8th Cir. 2001)).

Here, the right of Martin to be free from excessive force was a clearly established right, and no reasonable officer in Officer Herman's position would have had sufficient probable cause to believe that Martin posed a threat of serious physical harm to him or to others. No crime had occurred, Martin was unarmed, and the scuffle between Officer Herman and Martin did not threaten serious physical harm.

Officer Herman cites as support Parks v. Pomeroy, 387 F.3d 949 (8th Cir. 2004). Parks concerned a domestic violence dispute where an unarmed man resisted arrest and persisted after being sprayed with mace. Id. at 951–52. When the police officer grappling with Parks on the floor yelled "I think he's going for my gun!" the other police officer on the scene warned Parks not to reach for the gun. Id. at 952–53. Thinking Parks was reaching towards the grappling police officer's gun, the standing police officer fired two shots at Parks, killing him. Id. In Parks, the Eighth Circuit found that the facts supported a grant of qualified immunity, because the gun was within inches of Parks' hand, "circumstances were extremely volatile and potentially deadly, and the events were evolving rapidly." Id. at 958. Here, however, it is disputed both whether Martin ever reached for the gun and whether Martin knew or believed Officer Herman was a police officer. Additionally, it is disputed whether Martin ever saw the gun. Compare 2d Foster Aff. ¶ 7 with Herman Dep. 120:3-10. Unlike Parks, Martin was not suspected of any crime, let alone a violent crime, was not being arrested and was not fleeing. Officer Herman had no reason to believe Martin was armed. Finally, the close proximity to the police station makes it less likely that Martin posed a serious threat of physical harm to Officer Herman. Because of the given state of the law at the time and these disputed facts, Officer Herman did violate a clearly established constitutional right, and qualified immunity is inappropriate.

### C. Official Immunity

Plaintiff also asserts a wrongful death claim pursuant to Minn. Stat. § 573.02, to which Officer Herman contends he is entitled official immunity. In Minnesota, official immunity provides that a public officer "charged by law with duties which call for the exercise of his

16

judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Cnty. of Rice, 423 N.W.2d 671, 677 (Minn. 1988) (internal quotation marks omitted). A police officer's decision to use deadly force is just such a discretionary duty. Maras v. City of Brainerd, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993). "In determining whether an official has committed a malicious wrong, we consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited." State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571–72 (Minn. 1994) (citing Rico v. State, 472 N.W.2d 100, 107–08 (Minn. 1991)).

Although Officer Herman was performing a discretionary act when he stopped to investigate the events of November 3, he is not entitled to official immunity because a genuine issue exists as to whether he is guilty of a willful wrong. Importantly, as noted previously the facts are disputed as to whether Officer Herman identified himself as a police officer, and whether Martin believed him. The cases finding official immunity involving a police officer's use of deadly force regard an on-duty, uniformed officer. See, e.g., Loch, 837 F.Supp.2d at 1036–37 (finding official immunity when on-duty police officer arrived in squad car, turned on emergency lights, and subsequently shot suspect who was reaching toward what looked to be a gun); Roberson v. City of Austin, No. 06-CV-598, 2007 WL 2695782, at *1–3 (D. Minn. Sept. 13, 2007) (granting official immunity when on-duty police officers wearing uniforms and driving squad cars fired at individual who attempted to run an officer down with his van); Hayek v. City of St. Paul, Civ. No. 05-867, 2006 WL 2883155, at *1–3 (D. Minn. Oct. 6, 2006) (finding official immunity when on-duty officers responded to 911 call and shot young male who attacked a police officer with a samurai sword). Here, however, the analysis is different because

Officer Herman arrived in his own unmarked personal vehicle, his physical appearance did not make it obvious he was a police officer, and it is unclear whether he identified himself as a police officer.  The recent case of Mattson v. Becker Cnty., Minn., Civ. No. 07-1788, 2008 WL 3582781 (D. Minn. Aug. 12, 2008) is similar.  In Mattson, an on-duty police officer never succeeded in activating his squad car emergency lights and siren and he failed to identify himself as a police officer prior to threatening deadly force and using his taser.  Id. at *10.  The Mattson court found the officer was not entitled to official immunity.  Id.  Likewise, Officer Herman may never have introduced himself as a police officer and he was off-duty at the time of the shooting, both factors which make official immunity inappropriate in this case.  Construing the facts in the light most favorable to the Plaintiff, a reasonably jury could find that Officer Herman committed a malicious wrong, and therefore he is not entitled to official immunity.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Officer John Herman's Motion for Summary Judgment [Docket No. 28] is **DENIED**.

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 30, 2012.